**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

Sabrina Jordan, Administrator of the Estate of
Jamarco McShann,

      *Plaintiff,*

v.                  **Case No. 3:18-cv-082**
                   **Judge Thomas M. Rose**

**Officer John Howard,** *et al.,*

      *Defendants.*

---

### ENTRY AND ORDER GRANTING IN PART MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS MICHAEL CORNELY, JUSTIN ELLER, JOHN HOWARD, JERRY KNIGHT, BRIAN O'NEAL, ECF 13, DECLINING TO EXERCISE JURISDICTION OVER STATE LAW CLAIMS AND TERMINATING CASE.

---

Although proverbial wisdom has for millennia taught the advantage of not provoking potentially dangerous situations, see Prov. 26:17, because the United States Supreme Court has refused to proclaim this wisdom to be clearly established Constitutional law, Defendants are entitled to qualified immunity. Pending before the Court is a document entitled Motion for Summary Judgment by Defendants Michael Cornely, Justin Eller, John Howard, Jerry Knight, Brian O'Neal, Unnamed Officers, ECF 13. Movants request that the Court award them summary judgment on all counts of Plaintiff's Complaint. ECF 1.

The Complaint arises from events of October 20, 2017, when police investigating a noise complaint chose to rouse a man they found sleeping in a car with a gun on his lap, after which he

put his hand on the gun, a reaction one might predict but which caused police to fear for their safety. The administrator of the man's estate filed a complaint asserting a claim for Unconstitutional Seizure in violation of 42 U.S.C. § 1983, a claim for State Law Wrongful Death Claim Pursuant to Ohio Revised Code § 2125.02, a claim for State Common Law Claim for Civil Conspiracy and State Law Claim for Assault and Battery. They further allege survivorship damages and allege Willful, Wanton and Reckless Conduct. The complaint names as defendants Officer John Howard, Officer Jerry Knight, Officer Michael Cornely, Officer Justin Eller, Officer Brian O'Neal and Unnamed Officers.

On October 30, 2019, Defendants Michael Cornely, Justin Eller, John Howard, Jerry Knight and Brian O'Neal moved for summary judgment. ECF 13. Plaintiff responded, opposing Defendant's motion, but allowing that she was no longer proceeding on claims against O'Neal and dismissing all claims against O'Neal. Plaintiff further limited her claims against Cornely to state law claims only waiving constitutional claims against him. ECF 25, at 14 n.4, PageID 957.

## I.    Background

In the early hours of October 20, 2017, Moraine police officers were dispatched to the Valley View Apartments for a noise complaint coming from a vehicle playing loud music. Knight Dep. at 44-45. Jamarco McShann—a 23-year-old black man was asleep in his girlfriend's car, outside their apartment. (DaShelle Sparks Dep., attached as Ex. 5, at 7, 16, 19, 21.) That night, Defendants Jerry Knight, Michael Cornely and John Howard worked their regular midnight shift together. (Howard Dep. at 72-73, ECF 16, PageID 196.) In response to the noise complaint, Knight was dispatched to Sunnyside Apartments at 3730 Pinnacle Park. (Id. at 95, PageID 202.)

Howard and Cornely also reported to the complex. (Id.; Cornely Dep. at 20-21, ECF 17, PageID 299.)

Knight arrived first. It was dark, and the area was illuminated only by some streetlights, mainly from apartment buildings. He walked approximately a block away—to 3750 Pinnacle Park—where he heard music coming from a parked car. (Knight Dep., ECF 15, PageID 72, at 47.) The vehicle was backed into a parking spot. Two SUVs were also parked nearby. (Id., PageID 75, at 59.) Knight approached the car and looked inside with his flashlight. (Knight Dep. at 58, ECF 15, PageID 75; Howard Dep. at 109, ECF 16, PageID 205.)

Knight saw a man sleeping, reclined in the driver's seat, with his left hand behind his head like a pillow. (Knight Dep. at 58, 61, ECF 15, PageID 75.) All the car windows were up. (Howard Dep. at 129, ECF 16, PageID 210.) Knight pulled on the door handle, but it was locked. (Cornely Dep. at 25.) When Knight saw McShann's hand on the gun, he backed up from the vehicle. (Knight Dep. at 62.)

By that time, Officer Cornely had arrived on the scene and Officer Knight said "hey, Mike, he's got a gun in his right hand." (Knight Dep. at 63, 66; Cornely Dep. at 22.) Knight and Cornely both claim they saw a gun on the sleeping man's lap, with the muzzle facing toward the driver's door, kind of at a slant. (Knight Dep., ECF 15, PageID 76 at 64.) The gun was a Ruger semi-automatic pistol, with a large extended magazine. Cornely radioed in a signal 13 (which stands for a gun) and they waited for Officer Howard to arrive. (Knight Dep. at 71.) Howard arrived. Howard claims that the muzzle was facing the "outboard" side of the car, pointing toward the left and behind the sleeping man. (Howard Dep. at 127, ECF 16, PageID 210; Knight Dep. at 72, ECF 15, PageID 78.)

Defendants did not know the identity of the sleeping man. They also knew nothing about whether he had any potential criminal history—and by extension, knew nothing about whether the man was subject to any restrictions on handgun possession. (Howard Dep. at 163, ECF 16, PageID 219.)

Defendants did not see evidence of drugs or other weapons. (Id. at 120, PageID 208.) Defendants do claim they were concerned about a potential overdose or medical emergency. However, they did not call EMS or attempt to provide any medical aide, did not check for breathing and did not attempt to wake the man until almost thirty minutes after they arrived on scene. (Id. at 197-98, PageID 227-28; see also Dispatch Record, attached as Ex. 6.)

After observing the man, Knight, Cornely and Howard gathered to the side of the apartment building. (See Exhibit 3 to Howard's Dep., ECF 16-1, PageID 271.) They decided to run the license plates. The plates came back registered to DaShelle Sparks, who lived in the apartments behind the parked car. (Knight Dep. at 73, ECF 15, PageID 78.)

Defendants decided to try to find Sparks in hopes that she could identify and help wake McShann. Defendants thought it would be helpful and less startling for a familiar person to wake the man rather than police. (Howard Dep. at 137-38, ECF 16, PageID 212.) Defendant Cornely went to owner's apartment and knocked on the door. (Howard Dep. at 137, ECF 16, PageID 212.) No one answered the door at the apartment. (Howard Dep. at 137-38, ECF 16, PageID 212-13; Knight Dep. at 74-75, ECF 79, PageID 79.) While Cornely went to the door, Knight and Howard waited by the tree. (Knight Dep. at 75, ECF 79, PageID 79.)

The officers suspected McShann was violating the law by improperly handling a firearm in a motor vehicle. (Cornely Dep. at 31; Howard Depo at 10, 89.) The possession of a loaded

gun in a motor vehicle without a license would give the officers probable cause to stop McShann. (Howard Depo at 15.) At the same time, Ohio is an open-carry state. Ohio law permits carrying weapons and does not per se prohibit extended capacity magazines. Ohio concealed handgun licenses allow loaded handguns inside vehicles and permit drivers to transport or have a loaded handgun on or about their person. (Ohio Rev. Code §2923.16(E); Ohio Rev. Code §2923.16(F)(5).)

The music was still blaring. (Knight Dep. at 76.) There were calls coming into McShann's cell phone and when that happened the music would stop, and it would ring real loud. (Knight Dep. at 76-77.) Howard, Knight and Cornely remained on the scene. Though Cornely was the senior officer, Howard took charge of the scene. (Howard Dep. at 150, ECF 16, PageID 216.) Howard decided to place stop sticks under the tires to prevent fleeing. (Cornely Dep. at 28-29, ECF 17, PageID 301; Knight Dep. at 75, ECF 15, PageID 79.) Knight moved his cruiser to shine his spotlight into the windshield of McShann's car. (Knight Dep. at 82, ECF 15, PageID 81.) The spotlight helped illuminate the interior, but it still was not that bright inside the car. (Howard Dep. at 149, ECF 16, PageID 215.)

At this point it was coming close to 5:30 in the morning and people were starting to come out to their vehicles to go to work. (Knight Dep. at 77, 93.) The Officers realized that kids were going to be getting ready for school very shortly. (Knight Dep. at 77.) While if McShann possessed a concealed carry license, Ohio law has declared that a man with a gun is not a concern for people coming out to their vehicles or for children getting ready for school, the officers were concerned. Indeed, at this hour, their clearest concern, the noise violation, was somewhat less pressing, as people were beginning to rise and go about their day.

Howard decided to call in officers O'Neal and Eller. Howard requested they bring a ballistics shield to approach the vehicle. (Cornely Dep., at 30- 31, ECF 17, PageID 302.) O'Neal and Eller arrived and joined Howard, Knight and Cornely in the grassy area by the tree. (Knight Dep. at 97, ECF 15, PageID 84.)

Defendants approached the vehicle, intending to disarm McShann and remove him from the vehicle to investigate the noise complaint. (Knight Dep. at 103, ECF 15, PageID 86.) Howard ordered everyone to their positions. Knight was to contact the driver. (Knight Dep. at 103, ECF 15, PageID 86.) Knight and O'Neal were to approach the driver's side with O'Neal on the shield. (Id.) Cornely was to post up on the passenger side to provide cover and additional light with his flashlight. (Howard Dep. at 147, ECF 16, PageID 215.)

Before the approach, Howard claims he instructed the others that if the sleeping man grabbed the gun, they should all stay back so they would not shoot across the car at each other. Howard also said that "they probably wouldn't even need to shoot" because he would have a clear line of sight from the back of the car and "would be able to stop the threat pretty quickly." (Howard Dep. at 153-54, ECF 16, PageID 216-17.) Knight positioned himself at the second pillar of the vehicle between the driver's window and the rear window, near the left shoulder of McShann, who remained reclined and asleep. (Knight Dep. at 105, 114, ECF 15, PageID 86, 89.) O'Neal was beside Knight, holding the shield. Knight never stood behind the shield. (Knight Dep. at 105-06, ECF 15, PageID 86-87.) Howard, meanwhile, drew his shotgun as he walked to the rear of the car. (Howard Dep. at 170, ECF 16, PageID 221.) Howard admits that when Defendants arrived at the car, no actual threat of death or serious physical harm existed. Instead, there was at most a potential threat and no reason to use deadly force. (Id. at 146, PageID 215.) McShann continued

sleeping soundly, with his left arm relaxed behind his head. (Knight Dep. at 115, ECF 15, PageID 89.)

Knight claims that during Defendants' approach, the gun remained on McShann's thigh, lying flat. The barrel allegedly faced the driver's side door, with the magazine facing the passenger side door. Knight alleges that McShann's hand was resting on the gun, but not gripping it. (Id. at 115-16, PageID 89.) No part of the gun was touching the center console. (Id.)

Howard positioned himself at the rear of the vehicle, behind McShann's seat. (Howard Dep. at 172, ECF 16, PageID 221.) In his deposition, where he claimed to have a clear line of sight to McShann's hand, Howard alleged that he stood in the middle rear of the vehicle. (Id.) However, in his interview with the Ohio Bureau of Criminal Investigation, Howard claimed he stood on the left rear side of the car. (See Exhibit 9 to Howard Dep., ECF 16-1, PageID 290.) Howard remained focused on the gun and McShann's hands from his position at the rear of the car. Howard saw McShann's right hand resting near, but not on the gun. (Howard Dep. at 172-73, ECF 16, PageID 221.)

Knight began to bang on the glass with his flashlight. He continued for approximately five to ten seconds until McShann awoke. (Knight Dep. at 112, 199, ECF 15, PageID 88, 90.) The Officers were screaming, "Police!" (Knight Dep. at 119-20.) "Keep your hands up in the air!" (Knight Dep. at 119-20.) "Show me your hands!" (Knight Dep. at 119-120; Cornely Dep. at 43.)

Defendants acknowledge that their tactics at the car could cause McShann to wake in a startled, scared manner and to experience a startle response, including but not limited to movements of his head, torso and arms. (O'Neal Dep. at 55-56, ECF 18, PageID 353.)

Defendants admit that the spotlight could make it difficult for McShann to see. (Knight Dep. at 88, ECF 15, PageID 82; Howard Dep. at 39-40, ECF 16, PageID 188.)

McShann appeared dazed and confused as he awoke. (O'Neal Dep. at 58, ECF 18, PageID 354; Exhibit 7 to O'Neal Deposition, ECF 18-1, PageID 381.)   He opened his eyes and took his left hand out from behind his head. (Knight Dep. at 119; Cornely Dep. at 43-44; Howard Depo at 175; O'Neal Depo at 49.)   He took his right hand off the gun and sat up a little bit. (Knight Dep. at 119; Cornely Dep. at 44.)   He put his hands up in the air, palms facing forward. (Knight Dep. at 123; Cornely Dep. at 44.)   He turned to the left and looked at Knight with his hands up in the air. (Knight Dep. at 120, 123; Cornely Dep. at 44; Howard Depo at 175-176; O'Neal Depo at 52.) He turned to the right and looked right at Cornely with his hands still up in the air. (Knight Dep. at 120, 123; Cornely Dep. at 44-45; Howard Depo at 176; O'Neal Depo at 52.)   He turned and looked back at Knight, then turned and looked at Cornely. (Knight Dep. at 120; Cornely Dep. at 45; Howard Depo at 176; O'Neal Depo at 52.)

DaShelle Sparks, McShann's fiancé, had been at her cousin's apartment nearby when Cornely knocked on her door. (Sparks Dep., Ex. 5, at 27.)   A neighbor later informed Sparks of the situation outside and she went outside with her cousin. (Id. at 28.)   She saw police around her car.[1]   Sparks told police that she owned the car and her son's father was inside. (Id.)   Eller approached, pointed his gun in Spark's face and ordered the women to put up their hands up or he would shoot. (Id.)   They complied, took a couple steps away and before they heard the police shoot McShann. (Id. at 28-29; Eller Dep. at 90, 98-100.)

---

[1] Sparks did not hear the yelling, nor music playing from the car. (Id.)

McShann then turned to the left again, looked at Knight grabbing the gun. (Knight Dep. at 123-124; Cornely Dep. at 45, 56; Howard Depo at 176; O'Neal Depo at 57.)   After grabbing the gun, he began turning his body toward Knight. (Knight Dep. at 124.)   The gun was already toward O'Neal and Knight. (Knight Dep. at 125; O'Neal Depo at 67.)   The Officers were all still yelling police! (Knight Dep. at 128.)   Show us your hands, show us your hands, show us your hands! (Knight Dep. at 128.)   Keep your hands off the gun! (Knight Dep. at 128.)   The officers were yelling commands at McShann over the music for five to ten seconds and during that time he was moving. (Knight Dep. at 132; Howard Depo at 182.)

According to Knight, Cornely and O'Neal, McShann started raising the gun in the direction of Knight and O'Neal. (Knight Dep. at 124-125; Cornely Dep. at 57; O'Neal Depo at 16, 58-59, 67.)   O'Neal was in fear for his life. (O'Neal Depo at 67, 99.)   Knight also feared for his life and feared for the lives of his co-workers. (Knight Dep. at 151.)   Cornely believed McShann posed a deadly threat to the Officers. (Cornely Dep. at 58.)   Knight fired his weapon and yelled, "Shots fired!" (Knight Dep. at 125, 132-133.)   Simultaneously, Howard fired two shots. (Howard Depo at 189.)   The shots hit McShann and he dropped the gun. (Knight Dep. at 134; Howard Depo at 189.)

Approximately 10 seconds after McShann woke, Howard and Knight shot Jamarco McShann. (Howard Dep. at 183, ECF 16, PageID 224.)   Howard fired two rounds of his shotgun. Knight fired seven bullets from his pistol.   Knight shot first. (Cornely Dep. at 58, ECF 17, PageID 309.)

Knight testified that he did not face a threat of death or great bodily harm until the gun was turned toward Knight:

Q.· So do you believe that the threat of deadly -- of, like, great bodily harm to yourself or your fellow officers arose once he had that gun in his hand and turned toward you?

A.· · Absolutely.

Q.· And before that point, there was no threat of death or great bodily harm to you or your –

A.· · There was no threat, just the fear –

(Knight Dep., ECF 17, PageID 98 p.151-152.)

Importantly, Howard, who was standing somewhere behind McShann, testified that McShann never moved the gun before Howard pulled the trigger of his shotgun. Howard testified that McShann was startled awake and sat up. (Id. at 177, PageID 222.) Howard is also clear that he never saw McShann point the gun:

Q.    How did he grab the gun?

A.    He picked it up with his right hand.

Q.    On the handle?

A.    Yes.

Q.    Okay.   Did you see him put his finger on the trigger?

A.    No, not specifically.

Q.    Did you shoot as soon as he reached for the gun?

A.    When he picked up the gun, yes.

Q.    Okay.   Where was—like assume this (indicating) is the gun, right, just for demonstration purposes.   Where was the gun in relation to his lap where he picked it up when you shot?   How high had he reached it?

A.    I have no idea.

Q.      Was it more than an inch off his lap?

A.      I have absolutely no idea.

Q.      Okay.   Could you still see the gun in his hand at the time that you shot him?

A.      I don't know.   When he grabbed the gun, I stopped focusing on the gun.   I wasn't looking at the gun anymore.

Q.      So, you have no idea what he did with the gun once it was in his hand?

A.      He picked it up.

Q.      Right.   But then you don't know what he did with the gun?

A.      Correct.

Q.      Okay.   So, you don't know whether he was going to move the gun to the side so that he could get out of the car, right?

A.      Correct.

Q.      …Did you ever see him move the gun in front of his body?

A.      No.

Q.      Did you ever see him point the gun at anyone?

A.      No.

Q.      Okay.   Did anything else happen before you fired that you haven't told me about yet?

A.      He scanned, and he picked up the gun, that's it.

Q.      Okay.   Did you—and you don't—there is nothing else that you recall, like, your co-defendants doing on the scene there in those moments before you fired, either, that you haven't already told me?

A.      Correct.

(Howard Dep. at 184-86, ECF 16, PageID 224-25.)   Later, he continued, "I didn't care whether I was firing first.   I was firing because there was a threat.   Whether it was first, second, or third, the thought never entered my mind." (Id. at 187, ll. 8-11, PageID 225.)[2]

While Defendants claim Howard testified that "McShann grabbed the gun, turned his body toward Knight, turned the gun toward Knight and began raising the gun in Knight's direction. … Howard Depo at 176, 189," Howard did not testify to that effect on page 189.   On page 176, he testifies, "He grabbed the gun with his right hand and I shifted my attention from there to -- to the left a little to center mass and I pulled the trigger." Id. ll. 9-13.   Howard is repeatedly clear that he shot when he saw McShann grab the gun, not seeing whether it ever moved.

Officer Cornely sent a "signal 99" which informs others an officer needs help and Detective Eller called for a medic. (Knight Dep. at 149; Eller Dep. at 106.)   They wanted to get McShann out as quickly as possible to start first aid. (Knight Dep. at 154.)   Knight reached through the broken glass and opened the door. (Knight Dep. at 153.)   Knight and O'Neal pulled McShann out of the vehicle back to the sidewalk grassy area to start first aid. (Knight Dep. at 160; Cornely Dep. at 65; O'Neal Depo at 78.)   Knight was saying "stay with me, keep breathing." (Knight Dep. at 161; Eller Dep. at 109.)   O'Neal ripped his shirt off trying to find the bullet holes and tried to plug him up as best as he could to clot the wounds and stop the bleeding. (O'Neal Depo at 81.)   Knight and O'Neal put pressure on the wounds they saw. (Knight Dep. at 162; O'Neal Depo at 81-82.) They continued putting pressure on McShann's wounds until the medics arrived. (Knight Dep. at

---

[2]  There is no police body camera footage to resolve differences in the police officers' testimony.   "The Moraine police department is one of the few in the Dayton area which does not have its officers equipped with cameras." Nick Blizzard, *Moraine Considering Equipping Police with Body Cameras*, DAYTON DAILY NEWS, April 19, 2019, https://www.daytondailynews.com/news/local/moraine-considering-equipping-police-with-body-cameras/bDF03eALHXfeuXmLWtARsL/

164; O'Neal Depo at 81-82.)  McShann sustained at least six gunshot wounds, including two shotgun wounds, causing his death.

Presumably, someone turned off the stereo.

Cornely testified that he found the gun "…on the left-hand side of the passenger seat closest to where McShann had been…positioned laying on its right side with the muzzle pointing toward the dashboard." (Cornely Dep. at 86, ECF 17, PageID 316; see also Knight Dep. at 145, ECF 15, PageID 96; Howard Dep. at 189, ECF 16, PageID 225).  He alleged that the grip of the gun was "pointed towards the driver's side" of the car.  Cornely testified that he took the gun and placed it in the trunk of his police cruiser and later in Knight's cruiser—unsecured, not in an evidence bag and on top of other items in the trunk. (Id. at 87, PageID 316; Scene Photo - Gun in Trunk, attached as Ex. 12.)  In the aftermath, the gun was eventually moved to the trunk of a police cruiser.  When Cornely left the scene, he once again moved the gun, this time putting it—still unsecure—in the trunk of Knight's cruiser. (Cornely Dep. at 79, ECF 17, PageID 314.)

Plaintiff asserts that forensic evidence refutes Defendants' claim that Jamarco McShann was holding a gun in his hand at the time of the shooting.  Jeremy Bauer, Ph.D., a certified accident reconstructionist and forensic photographer and biomechanics expert analyzed findings from the autopsy, locations of bullet holes and blood in McShann's vehicle and testimony from Defendants about their locations and movements during the shooting.  Bauer concluded that McShann was not holding or gripping the gun when he was shot in the right hand. (See Autopsy Report, attached as Ex. 8; Autopsy Photos of McShann's Hand, attached as Ex. 9; Scene Photos - Car, attached as Ex. 10; Scene Photo - Gun, attached as Ex. 11.)  According to Bauer, the angle of this gunshot wound is consistent with McShann's right hand being raised in front of him, near

shoulder level, when the base of his right thumb was struck by Knight's bullet. (Bauer Report at ¶18.)

Further, the grip of the handgun the officers testify McShann held at the time of the shooting suffered no damage. (See Bauer Report at Figure 16.) Bauer reasons that if the gun had been in McShann's right hand when he suffered the gunshot wound to his thumb, given the wound path through his hand, the gun would have been struck by the bullet. But the gun reveals no damage to the grip, where the webbing on McShann's thumb area and palm would have been in contact with the gun. (Bauer Report at ¶16 and Figure 15.) At the time McShann suffered the thumb gunshot, Bauer believes his hand was likely pointed forward (Bauer Report at Figures 12, 14), toward the right front quarter of the car. (Bauer Report at ¶¶13, 16.) Bauer concludes that McShann was therefore not holding a gun and pointing toward the driver's side, as Knight alleges, nor grabbing the gun on his lap, as Howard alleges.

Neither Howard nor Knight concede that McShann's right hand was ever raised in front of him, near shoulder level, pointed forward—while not holding a gun—during this shooting. They both assert that McShann's hand was gripping—or holding and pointing to the side—the gun when he was shot. (Howard Dep. at 176, ECF 16, PageID 222-23, 178-81; PageID 224, at 185; Knight Dep. at 143-44, ECF 15, PageID 96.)

Photographs of the gun include blood streaks on the right side of the slide. (Scene Photo - Gun, Ex. 11; Bauer Report at ¶17 and Figures 16, 17.) The Ohio Bureau of Criminal Investigation tested the gun for blood in the same location, found a presumptive positive result for blood on the right side of the slide. (See Deposition of Sabrina Selbe, attached as Ex. 13, at 27-28; see also Selbe Dep. Exhibit 22 and Selbe Dep. Exhibit 23 at 3.) Dr. Bauer explains that photographs of

the front passenger seat (see Bauer Report, Figure 17) do not show any blood on the surface of the seat. Officers at the scene also did not document any blood on the passenger seat surface. Bauer concludes that Cornely's description of the gun is inconsistent with Howard's and Knight's allegations about the gun in McShann's hand (whether pointed at Howard or not) at the time he was shot. (Bauer Report at ¶17.)

Police practices expert Melvin Tucker opined that Defendants violated law enforcement standards and training on vehicle extractions, which led to an unjustified and unnecessary shooting. Defendants positioned themselves in a way to create danger. (See Tucker Affidavit and Report, attached as Ex. 14.)

On March 20, 2018, Sabrina Jordan, administrator of McShann's estate, filed suit in this Court asserting a claim for Unconstitutional Seizure in violation of 42 U.S.C. § 1983, a claim for State Law Wrongful Death Claim Pursuant to Ohio Revised Code § 2125.02, a claim for State Common Law Claim for Civil Conspiracy and State Law Claim for Assault and Battery. Jordan further alleged survivorship damages and alleged willful, wanton and reckless conduct. The complaint names as defendants Officer John Howard, Officer Jerry Knight, Officer Michael Cornely, Officer Justin Eller, Officer Brian O'Neal and Unnamed Officers. ECF 1.

On October 30, 2019, Defendants Michael Cornely, Justin Eller, John Howard, Jerry Knight and Brian O'Neal moved for summary judgment. ECF 13. Plaintiff responded, opposing Defendant's motion, but allowing that she was no longer proceeding on claims against O'Neal and dismissing all claims against O'Neal. Plaintiff further limited her claims against Cornely to state law claims only waiving constitutional claims against him. ECF 25, at 14 n.4, PageID 957.

## II.     Standard

A moving party is entitled to summary judgment if the pleadings, the discovery and the disclosure materials on file and any affidavits "show [ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. at 56(a). There is no genuine issue for trial where the record "taken as a whole could not lead a rational trier of fact to find for the non–moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). We must ultimately decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one–sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). In doing so, the evidence is construed and all reasonable inferences are drawn in favor of the nonmoving party. *Hawkins v. Anheuser–Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008).

## III. Analysis

Plaintiff has dismissed all claims against Officer Brian O'Neal. Plaintiff's Opposition, n.14, ECF 5; PageID 957. Neither is Plaintiff proceeding on her federal constitutional claims against Officer Michael Cornely. Id. Thus, Cornely and O'Neal are entitled to summary judgment as a matter of law on Plaintiff's federal claim.

The remaining Defendants claim they are entitled to qualified immunity on Plaintiff's federal claim. The qualified immunity doctrine shields government officials performing discretionary actions from civil damages liability as long as their actions reasonably could have been thought consistent with the rights they are alleged to have violated. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Even if a government official deprives a plaintiff of a federal right, "qualified immunity will apply if an objective reasonable officer would not have understood, by

referencing clearly established law, that his conduct was unlawful." *Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999).

"Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (citations omitted); see also *Brosseau v. Haugen*, 543 U.S. 194 (2004); *Saucier v. Katz*, 533 U.S. 194 (2001).

In *Saucier*, the Court dictated a two-step inquiry which initially questioned whether there was a potential constitutional violation and only then asked whether the implicated right was 'clearly established.' However, in *Pearson* the United States Supreme Court held that courts are no longer obliged to conduct the qualified immunity analysis in the sequence set forth in *Saucier*. *Pearson*, 555 U.S. at 239.

Once the defense is raised, the plaintiff has the burden of demonstrating a violation of a constitutional right and showing that the right was clearly established. *Barrett v. Steubenville City Schools*, 388 F.3d 967, 970 (6th Cir. 2004). This inquiry turns on the circumstances of the case compared to prior precedent. *Poe v. Haydon*, 853 F.2d 418, 425 (6th Cir. 1988). Ordinarily, these questions can be answered by the court as a matter of law. See *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996). *Schroeder v. City of Vassar*, 371 F. Supp. 2d 882, 896 (E.D. Mich. 2005), *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

The Court notes the growing frustration with the qualified immunity doctrine, here voiced by Judge Crenshaw:

> qualified immunity is a controversial doctrine that can (1) lead to the head-scratching and frustrating outcome of a "right" becoming "clearly established" at the pleasure and indeterminate speed of various jurists, and (2) undercut some of the core purposes of 42 U.S.C. § 1983. See, e.g., Scott Michelman, *The Best Branch Qualified to Abolish Immunity*, 93 NOTRE DAME L. REV. 1999, 2000 (May 2018) ("The critics and critiques of qualified immunity ... are by now legion. Qualified immunity has been attacked as ahistorical; unjustified as a matter of statutory interpretation; grounded on inaccurate factual assumptions; antithetical to the purposes of official accountability and of the statute of which it is putatively a part; unadministrable; regularly misapplied; a hindrance to the development of constitutional law; a basis for strategic manipulation by judges; and a source of jurisdictional problems."); William Baude, *Is Qualified Immunity Unlawful?*, 106 CALIF. L. REV. 45 (Feb. 2018) ("Th[e qualified immunity] framework makes it hard to find a roadmap to the denial of immunity that could give a lower court confidence in its conclusion."); Joanna C. Schwartz, *How Qualified Immunity Fails*, 127 YALE L.J. 2, 64 (Oct. 2017) ("Commentators have long criticized qualified immunity doctrine for protecting government officials at the expense of Section 1983's accountability goals."). But it is within this framework that the Court currently must operate. That courts are so restricted by the restrictions and technicalities of this judicial doctrine is somewhat ironic given that the Supreme Court has broadly instructed that judges are to look to the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003).

*Spainhoward v. White Cty., Tennessee*, No. 2:18-CV-00015, 2019 WL 6468583, at *9, n.10 (M.D. Tenn. Feb. 1, 2019)(Crenshaw, J.).

The Court further pauses to note that this is not the only way a democratic society might balance this question. Consider, for example, the European Court of Human Rights' willingness to scrutinize police planning that leads to a use of force:

However, the use of force must be no more than "absolutely necessary" for the achievement of one of the purposes defined in sub-paragraphs (a), (b) and (c) [of Article 2 § 2 of the European Convention on Human Rights, allowing force "in defense of any person from unlawful violence; in order to effect a lawful arrest or to prevent the escape of a person lawfully detained; or in action lawfully taken for the purpose of quelling a riot or insurrection."].

In this respect the use of the term "absolutely necessary" in Article 2 § 2 indicates that a stricter and more compelling test of necessity must be employed than that normally applicable when determining whether State action is "necessary in a democratic society" under paragraphs 2 of Articles 8 to 11 of the Convention. In particular, the force used must be strictly proportionate to the achievement of the aims set out in sub-paragraphs 2 (a), (b) and (c) of Article 2.

Furthermore, in keeping with the importance of this provision in a democratic society, the Court must, in making its assessment, subject deprivations of life to the most careful scrutiny, particularly where deliberate lethal force is used, taking into consideration not only the actions of the agents of the State who actually administer the force but also all the surrounding circumstances, including such matters as the planning and control of the actions under examination (see the McCann and Others judgment cited above, at 45–46, §§ 147–50).

Having regard to the above considerations the Court is of the view that it has not been shown that the rescue operation was not planned and organized in a way which minimized to the greatest extent possible any risk to the lives of the couple.

*Andronicou and Constantinou v. Cyprus*, 25052/94, 1997-VI Eur. Ct. H.R. 2059, para. 185-86 (Sept. 10, 1987).

Such an approach is not entirely foreign to Constitutional interpretations considered by other circuits in our system. See *Billington v. Smith,* 292 F.3d 1177 (9th Cir.2002) (holding that a plaintiff's Fourth Amendment claim against police officers who used deadly force may survive summary judgment, even where the particular seizure is reasonable, if the defendant police officers

acted recklessly in creating the circumstances which required the use of deadly force. *Id.* at 1189 (stating that "even though the officers reasonably fired back in self-defense, they could still be held liable for using excessive force because their reckless and unconstitutional provocation created the need to use force.")) (abrogated by *County of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539, 1546 (2017)).

Even prior to *Mendez*, the Sixth Circuit rejected *Billington*. See *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007). Under Sixth Circuit precedent, courts are to view excessive force claims in segments. Id. (citing *Gaddis v. Redford Twp.,* 364 F.3d 763, 772 (6th Cir.2004); and *Dickerson v. McClellan,* 101 F.3d 1151, 1161 (6th Cir.1996)). A court should first identify the "seizure" at issue here and then examine "whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances." Id. (quoting *Dickerson,* 101 F.3d at 1161 (quoting *Carter v. Buscher,* 973 F.2d 1328, 1332 (7th Cir. 1992))). The *Dickerson* court reasoned:

> The time-frame is a crucial aspect of excessive force cases. Other than random attacks, all such cases begin with the decision of a police officer to do something, to help, to arrest, to inquire. If the officer had decided to do nothing, then no force would have been used. In this sense, the police officer always causes the trouble. But it is trouble which the police officer is sworn to cause, which society pays him to cause and which, if kept within constitutional limits, society praises the officer for causing.

*Id.* at 406-07 (quoting *Plakas v. Drinski,* 19 F.3d 1143, 1150 (7th Cir.1994)); see also *Cole v. Bone,* 993 F.2d 1328, 1333 (8th Cir.1993). Thus, de-escalation is not constitutionally mandated.

Indeed, this framework leads to a situation where "a police officer would be justified in standing on the side of a busy highway, stepping in front of speeding cars and firing into the windshields under the guise of self-defense. *Cox v. Vill. of Pleasantville*, 271 F. Supp. 3d 591, 618

(S.D.N.Y. 2017) (Karas, J.).    Nevertheless, it is within this framework that this Court currently must operate.    In this Circuit "'[w]e do not scrutinize whether it was reasonable for the officer to create the circumstances." *Thornton v. City of Columbus*, 727 F. App'x 829, 837 (6th Cir. 2018) (quoting *Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017) (internal quotation marks and citation omitted).    "[A] different Fourth Amendment violation cannot transform a later, reasonable use of force into an unreasonable seizure." Id. (quoting *Los Angeles v. Mendez*, ⸻ U.S. ⸻, 137 S. Ct. 1539, 1544 (2017).

Defendants assert that even if the Court assumes that shooting McShann constituted a constitutional violation, Plaintiff cannot demonstrate that the law was so "clearly established" as to give the Defendants fair warning that their conduct was illegal.    The Supreme Court has explained that "the right the official is alleged to have violated must have been 'clearly established' in a more particularized and hence more relevant sense:    The contours of the right must be sufficiently clear that a reasonable official would understand that what he was doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).    Thus, the relevant question is whether a reasonable officer could have believed that his or her actions were lawful. Id. at 641.    "If officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).    Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Id.    The doctrine of qualified immunity recognizes that these officials must routinely make close decisions in the exercise of their authority and that the law that guides their conduct is often ambiguous and difficult to apply. *Davis v. Scherer*, 408 U.S. 183, 196 (1984).

"Although qualified immunity is an affirmative defense, the ultimate burden is on the plaintiff to show that the defendant is not entitled to qualified immunity." *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1992). The plaintiff must prove that a reasonable police officer in the defendants' position would have clearly understood that he was under an affirmative duty not to perform the use of force. *Wallace v. City of Shelby*, 968 F. Supp. 1204, 1211 (N.D. Ohio 1997).

United States Supreme Court and Sixth Circuit precedent support the conclusion in this case, even when the record is considered in the light most favorable to Plaintiff, that there are no genuine issues of material fact which preclude summary judgment in favor of the Defendants, as their conduct was objectively reasonable and did not violate clearly established law. The use of deadly force by a police officer is justified "when the factual situation revealed a perceived serious threat of physical harm to the officer or others in the area from the perspective of a reasonable officer." *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005).

Other circuits have upheld a police officer's use of deadly force when a suspect was not gripping a gun, but whose hand was "just inches" from his hand. *Parks v. Pomeroy*, 387 F.3d 949, 957 (8th Cir. 2004). Sixth Circuit caselaw is similar: "A police officer need not wait for a suspect to open fire on him, much less wait for the suspect to actually hit him, before the officer may fire back." *Greathouse v. Couch*, 433 F. App'x 370, 373 (6th Cir. 2011). Thus, given the state of the law at the time and the facts of this case—Defendants did not violate a clearly established constitutional right. "Qualified immunity operates in this case ... just as it does in others, to protect officers from the sometimes 'hazy border between excessive and acceptable force' and to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful."

*Saucier v. Katz*, 533 U.S. at 206 (internal citation omitted).   Thus, this Court will grant summary judgment to Defendants.

Plaintiff alleges to have forensic evidence to show that McShann was not holding the gun at the time he was shot. (Plaintiff's Opposition, ECF 25; PageID 959).   There is no physical evidence or eye witness testimony that contradicts Howard's statements that McShann grabbed the gun.   While McShann may have been moving the gun off his lap to exit the car, Officers feared for their safety in the presence of the man they had roused from sleep.

Plaintiff's attempts to contradict the physical evidence and the Officers' statements based on the report of her expert, Jeremy Bauer, are ineffectual.   While Bauer states that: "The lack of damage to the gun provides clear evidence that McShann was not holding the gun when he was shot in the hand," (Bauer Report, ECF 25- 4; PageID 1011), Bauer's opinion is not sufficient to create a genuine issue of material fact.   Moreover, the reasoning underlying Bauer's opinion is not scientifically valid and his opinion lacks relevance and reliability.   First, Bauer's merely concludes that McShann was not holding the gun when he was shot in the hand. Bauer Report, ECF 25-4; PageID 1011.   Per Bauer's report, Howard fired two shots from his police issued H&K Binelli model M1 Super 90 shotgun and Knight fired eight shots from his police issued Glock model 21 Gen 4 .45 caliber pistol. (Bauer Report, ECF 25-4; PageID 995).   The autopsy identified "Multiple (at least 6) gunshot wounds" to McShann's body. (Bauer Report, ECF 25-4; PageID 997).

Bauer's report finds the order of the two shotgun shots to be unknown. (Bauer Report, ECF 25-4; PageID 1006).   Likewise, Bauer's report does not address the order of the pistol shots, whether the shotgun or pistol was fired first, nor whether the weapons were fired simultaneously.

Thus, there is no way to determine where McShann was shot first or in what order he suffered those wounds. Thus, even assuming Bauer's opinion that McShann was not holding the gun when he was shot in the hand is true, that does not automatically contradict the Officers' testimony that McShann was pointing a gun at Knight at the time he was shot. The wounds to McShann's back, right arm, right torso, right forearm, or left upper arm could have happened first, causing McShann to release the gun.

A speculative expert report cannot be the basis to overcome summary judgment on qualified immunity and use of force. See e.g. *Boyd v. Baeppler*, 215 F.3d 594, 603, 604 (6th Cir. 2000) (stating that "[t]he speculation of plaintiff's expert is not sufficient evidence to create a genuine issue of material fact" and that "[a]t the summary judgment stage, whether the legal violation alleged was clearly established at the time of the incident, as well as whether a genuine issue of material fact exists as to whether the alleged violation occurred, are questions of law for the court"). Bauer's report alone is insufficient to create a genuine issue of material fact in this case.

Bauer's opinions are not based on scientific, technical, or other specialized knowledge. Rather, his opinions are unsupported speculation. Under *Daubert*, this unreliable and speculative testimony is inadmissible because the reasoning underlying the testimony is not scientifically valid and cannot properly be applied to the facts at issue. *Daubert*, 509 U.S. at 579, 592-93. Because Bauer has no scientific basis for his opinions and his report only contains speculation as to what he thinks may have happened, this Court is unable to credit his conclusions.

Bauer also opines that:

Officers in Ohio are generally instructed in annual use of force training/firearms refresher training that some courts have found that an officer issuing commands to

a person holding a gun should expect the person to turn towards the officer and to raise the barrel of a gun an inch or so when responding to the commands because that is the most natural reaction when someone yells in your direction but those actions alone should not cause the officer to believe that he is then facing an immediate danger of serious bodily harm or death.

ECF 25-11, PageID 1107-08 (citing *Estate of Lopez v. Gelhaus*, 871 F. 3d 998 (9th Cir. 2017).

The Court notes that *Estate of Lopez* does not support Bauer's assertion. See 871 F.3d at 1021.

The case says only, "Turning is also the most natural reaction when someone yells in your

direction from behind.") Cf. *When 'Yelling Commands' Is the Wrong Police Response,*

https://www.nytimes.com/2016/09/30/us/when-yelling-commands-is-the-wrong-police-

response.html.

For these reasons, Defendants are entitled to qualified immunity and summary judgment

will be awarded to them on Plaintiff's claim for Unconstitutional Seizure in violation of 42

U.S.C. § 1983.

**State Law Claims**

Although Plaintiff's state law claims were properly asserted in this Court by means of the

supplemental jurisdiction provision of 28 U.S.C. § 1367, a court may decline such supplemental

jurisdiction where the court has dismissed all claims over which it has original jurisdiction. 28

U.S.C. § 1367(c)(3). The Court will decline to exercise its supplemental jurisdiction over

Plaintiff's state law claims.

**IV. Conclusion**

Because Defendants are protected from Plaintiff's federal claims by means of qualified

immunity, Defendants' Motion for Summary Judgment, ECF 13, is **GRANTED** with regard to

this claim. Because the Court declines to exercise its supplemental jurisdiction over this matter

it **DISMISSES** the remaining claims without prejudice. The captioned cause is hereby **TERMINATED** upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

  **DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, February 18, 2020.


                 s/Thomas M. Rose

           _____
               THOMAS M. ROSE
            UNITED STATES DISTRICT JUDGE